# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| MARK R. THOMAS,<br><br>Plaintiff,<br><br>v.<br><br>KELLY SANTORO,<br><br>Defendant. | Case No. 16-cv-05646-BLF<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**<br><br>[Re: ECF 1, 2] |

Mark R. Thomas ("Petitioner"), a state prisoner represented by counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state criminal conviction of five counts of California Penal Code § 211–212.5(C)(second degree robbery). Pet., ECF 1; *see also* ECF 2. Petitioner asserts that his Sixth Amendment rights were violated because his trial counsel provided him ineffective assistance of counsel. Respondent Kelly Santoro filed an answer, addressing the merits of Petitioner's claims, and exhibits in support thereof. ECF 14 ("Resp."), 15-1–4. Petitioner filed a traverse in response. ECF 29. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief and DENIES the petition for writ of habeas corpus.

## I. BACKGROUND

Petitioner was sentenced on July 1, 2013, to 125 years to life, consecutive to a determinate term of 75 years, in state prison after a jury in Santa Clara County Superior Court convicted him of five counts of second-degree robbery and, in a bifurcated trial, the court found true allegations that petitioner had three prior strike convictions, one prior serious felony, and one prior prison term. ECF 15-1, Clerk's Transcript ("CT") 322–26, 332–34, 397–401; ECF 15-2, Reporter's Transcript ("RT") 639.

Petitioner filed a notice of appeal on August 5, 2013. CT 404. On February 13, 2014, Petitioner filed a petition for habeas corpus to the California Court of Appeal, ECF 15-4, Ex. 4, which the court considered with Petitioner's appeal, *id.*, Ex. 5. On May 5, 2015, the Court of Appeal affirmed the judgment, *id.*, Ex. 8 ("Op."), and denied the petition for writ of habeas corpus, *id.*, Ex. 10. On July 8, 2015, the California Supreme Court denied Petitioner's petition for review and his petition for writ of habeas corpus. *Id.*, Exs. 11, 12.

Petitioner filed the instant habeas petition on October 5, 2016.

## II. SUMMARY OF EVIDENCE

In its written opinion, the California Court of Appeal fairly and accurately summarized the factual background of Petitioner's case at trial as follows:

**A. Prosecution Case**

At about 9:00 p.m. on March 23, 2009, Nelson Martinez, Omar Nava Carrillo, Raul Martinez, Marisela Maria Mercado Vargas, and Maria Del Pilar Garduno were working at a Burger King restaurant in San Jose when two armed men entered. One of them pushed Carrillo towards the office and demanded money from the safe. Carrillo gave him $7,930. According to Carrillo, this robber was wearing black pants, a blue sweatshirt, and gloves. Though Carrillo could not see the robbers' faces, he described their skin as "dark." Neither robber was wearing a hat.

The other robber grabbed Raul's[FN3] back, led him to the cash register, and told him to open it. According to Raul, the robber's face was covered, and he was wearing gloves and a black jacket. When Raul was unable to open the cash register, the robber demanded Raul's wallet. Raul gave him his wallet, which contained $400. The robber then told Raul to go to the back of the restaurant. Garduno saw the armed robber behind Raul, but could not see his face. The robber ordered Garduno, Nelson, and Vargas to go to the back of the restaurant. According to Nelson, the robbers were wearing long, black rain coats and dark blue or black pants. He could not tell what race they were, but they were taller than he was, and big and "more robust." Vargas did not know the race of the robbers.[FN4] They were both wearing a black, hooded sweatshirt or jacket, and gloves.

> [FN3] We refer to Raul Martinez and Nelson Martinez by their first names to avoid confusion
>
> [FN4] On the night of the robbery, Nelson told Officer Donald Guerra that the robbers were African American men.

Brandon Doe and Jesus Cuevas were in their car at the drive-thru window of the Burger King when the robbery occurred. After Garduno gave Brandon part of his order, he saw a masked man pointing a gun at her. The robber then pushed Garduno

2

to the next room and ripped the phone off the wall. Brandon called 911. While talking to the 911 operator, Brandon saw the two robbers exit the restaurant. As Brandon followed them in his van, the robbers ran to a Pontiac Grand Prix which was parked in a red zone. After the robbers jumped into the car, it took off. Brandon followed the car onto the northbound freeway.

As Brandon was following the car, he gave dispatch the license plate number. The car eventually exited the freeway and stopped abruptly on the shoulder of the off-ramp. Brandon went around the car and stopped in front of it. Two doors opened, and two people exited the car and ran through the ivy patch. After the car continued down the off-ramp and entered a gas station, Brandon followed. Ellamae Daigle exited the car and asked Brandon why he was following her. He replied, "You know why I'm following you. The police are on their way." The police arrived a minute later. They searched the ivy patch, but they were unable to locate the robbers.

According to Brandon, the robbers were African American and similarly dressed, though one wore a hood while the other wore a beanie. Cuevas described them as African American men who were wearing dark clothing with a hooded top.

When Lieutenant Keith Miller responded to the scene, he observed Daigle talking on her cell phone outside her car. He arrested Daigle. Lieutenant Jason Ta searched Daigle's cell phone and found defendant's phone number. He also searched the car and found a black beanie cap in the front passenger seat.

Cathleen Trowbridge, a criminalist, testified as an expert in the area of forensic analysis of DNA and identification of persons. The results of a DNA test of the beanie showed that defendant was a potential contributor. According to Trowbridge, "[t]he probability that somebody who didn't leave any DNA on that hat, still being considered a potential contributor [was] . . . one in 300 billion in the African American population, one in 1.2 trillion in the Caucasian population, and one in 5.6 trillion in the Hispanic population."

On August 5, 2009, Lieutenant Miller went to Gesiele Thomas's apartment to look for defendant. Thomas was defendant's cousin and lived near the Burger King that was robbed. Lieutenant Miller told Thomas that he had a warrant for defendant's arrest and asked if she knew about it. She responded that "family talk was that he had got in trouble . . . with that girl." Lieutenant Miller asked if he could search her residence. She consented to the search, but defendant was not there. He also asked her whether she had received a phone call from defendant. She eventually said that defendant called her that night when he "got in trouble . . . ." Thomas told him that she received a call from defendant around 11:00 p.m. and "he had told her he had been in trouble with the girl and wanted someplace to go. And she told him, that he was not welcome at her apartment." Defendant also told her that "he was going to have to go on the run and not to call him on his cell phone." Thomas also stated that she had not seen defendant since March.

Lieutenant Miller reviewed defendant's phone records. Defendant called Thomas at 12:49 a.m. on March 24, 2009, for one minute and 39 seconds. There were also more than 10 calls from defendant to his sister Mary Magee on the evening of the robbery.

3

At trial, Thomas did not remember the details of the interview with Lieutenant Miller or phone calls from either defendant or his sister on March 23, 2009. Magee could not remember at trial whether she had received phone calls from defendant on the night of the robbery.

While defendant was in jail awaiting trial, he called Magee.[FN5] During the May 26, 2011 phone call, he asked Magee to contact Thomas and ask her to tell the police that he was at Thomas's house on the night of the robbery. In a conversation in December 2011, defendant and Magee referred to the preliminary hearing and Thomas's potential testimony. Magee understood that when defendant referred to the girl, he was referring to Daigle.

> [FN5] Three of the taped conversations between defendant and Magee were played for the jury.

Jim Cook testified as an expert in the area of cellular technology and cell phone records analysis. After reviewing the subscriber information related to the cell phones of defendant and Daigle, he testified regarding their location based on the connection between their cell phones and the closest cell tower sites when the calls were initiated on the night of the robbery. Defendant's cell phone records showed that he was in the area of his residence and Daigle's residence in Palo Alto from 12:45 p.m. through 8:03 p.m. Defendant arrived in the area of the crime scene at 8:45 p.m. Defendant was in the area of the crime scene from 8:45 p.m. through 12:54 a.m. and he placed and received 26 calls. There were four calls to and from Daigle, 10 calls to and from Magee, and two calls to and from Thomas. Daigle's cell phone records showed that she began traveling from Palo Alto toward the area of the crime scene at 8:11 p.m. Daigle made cell phone calls in the area of the crime scene, the getaway route, and the arrest site between 8:44 p.m. to 11:04 p.m. Defendant's cell phone records showed defendant called Magee six times between 11:57 p.m. and 12:46 a.m. on the night of the robbery. At 11:58 p.m., Magee's cell phone connected to a cell tower site near her residence. After Magee received a call from defendant at 12:36 a.m., she traveled from her residence to the area of the crime scene. While in the area of the crime scene, she received five more calls from defendant. At 1:23 a.m., Magee traveled toward defendant's residence as she placed a call to him.

On cross-examination, Cook conceded that his analysis did not reveal the identity of the person holding the cell phone when the call was made. Cook also acknowledged that he was unable to determine whether a cell tower site was not functioning in 2012. Thus, the cell phone records would not disclose whether a particular cell phone connected to the next closest cell tower site, thereby inaccurately indicating the location of the cell phone.

The parties stipulated that the prosecution called Daigle as a witness in this case. She refused to testify and was held in contempt outside the presence of the jury.

**B. Defense Case**

Officer Brian Egan investigated a robbery, which occurred on February 10, 2009, at an art supply store in Mountain View. During the investigation, he discovered that

4

United States District Court
Northern District of California

a car, which was associated with this robbery, was registered to Rekeshia Duffy, Daigle's daughter. At the time of trial in the present case, the art store robbery remained unsolved. Lieutenant Jeffrey Sato also participated in the art store robbery investigation. During a search of Duffy's vehicle, he "found the front sight of a Glock handgun." The vehicle was released to Daigle on March 6, 2009.

Op. at 2–6 (alterations in original).

### III. LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review. *See* Exs. 11 & 12. The California Court of Appeal, in its opinion on direct review, addressed the ineffective assistance of counsel claims Petitioner raises in the instant petition. *See generally* Op. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## IV. DISCUSSION

Petitioner asserts a claim for ineffective assistance of counsel for his trial counsel's "failure to object to cell phone tower tracking evidence and/or obtain [a] defense expert" to rebut the government's cell-tower methodology expert Mr. Cook. *See* Pet. at 9. Specifically, Petitioner contends his counsel was ineffective for a variety of reasons, all related to his failure to challenge Mr. Cook's evidence, including by "(1) failing to challenge Mr. Cook's qualifications on this

subject (RT 336); (2) by failing to request the People provide a proffer of the testimony (in order to object) (RT 337); (3) by failing to move to strike at the conclusion of direct testimony (RT 432); (4) by failing to cross-examine . . . ; (5) by failing to call his own expert . . . (RT 432–436.)"; and (6) by failing to file a motion in limine or other motion challenging the reliability of the cell-tower methodology. Pet. at 17.

On direct review, the Court of Appeal considered and rejected this claim and the grounds Petitioner raises here:

> Defendant contends that his trial counsel rendered ineffective assistance when he failed to file a motion in limine to exclude Cook's testimony on *Kelly*[1] grounds. He also contends that trial counsel's performance was deficient, because he failed to: (1) challenge Cook's qualifications; (2) request that the prosecutor provide a proffer of the testimony; (3) move to strike at the conclusion of direct testimony; and (4) call his own expert.
>
> "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) That right "entitles the defendant not to some bare assistance but rather to effective assistance." (*Ibid.*) But the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)
>
> "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92–93.)
>
> Pursuant to the *Kelly* rule, "the proponent of evidence derived from a new scientific methodology must satisfy three prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that '"correct scientific procedures were used in the particular case."'" (*People v. Roybal* (1998) 19 Cal.4th 481, 505.)
>
> When trial counsel reasonably determines that filing a motion would be futile, his failure to do so does not constitute deficient performance. (*People v. Price* (1991) 1 Cal.4th 324, 387, superseded by statute on other grounds in *People v. Hinks* (1997)

---

[1] *People v. Kelly*, 17 Cal. 3d 24 (1976).

7

58 Cal.App.4th 1157, 1161–1165.) Here, as the Attorney General points out, the cell tower tracking technique had been widely accepted and admitted into evidence in courts throughout the nation at the time of defendant's trial in January 2013. (*See, e.g.*, *People v. Martin* (2002) 98 Cal.App.4th 408, 412 [prosecutor "relied on [the defendant's] cell phone records to establish his location during the crucial time period"]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1016–1017 [prosecutor relied on cell phone records to establish the locations of defendant's accomplices]; *United States v. Dhinsa* (2d Cir.2001) 243 F.3d 635, 661 [cell phone records confirmed the defendant's presence in the area where the victim was murdered]; *Pullin v. State* (Ga.2000) 534 S.E.2d 69, 71 [Georgia Supreme Court concluded that evidence supported the finding that "sound scientific theory" supported the use of cell phone records to establish the location of calls]; *State v. Tran* (Minn.2006) 712 N.W.2d 540, 543–545 [cell phone records showed that the defendant was in the victim's neighborhood when the murder occurred]; *Wilson v. State* (Tex.Ct.App.2006) 195 S.W.3d 193, 196–197 [cell phone records showed the defendant "traveling from the vicinity of his residence to the victim's residence during the time period in question"]; and *Pantazes v. State* (Md.Ct.App.2001) 785 A.2d 865, 872 [cell phone records suggested that call from victim's phone to the defendant's phone not made from the victim's home].) Since a reasonably competent attorney would have concluded that a challenge to the cell tower tracking evidence on *Kelly* grounds was futile, defendant has failed to show that trial counsel's performance was deficient.[FN6]

> [FN6] Defendant also claims ineffective assistance of counsel based on trial counsel's failure to: (1) challenge Cook's qualifications on the subject; (2) move to strike Cook's testimony; (3) cross-examine Cook on the limits of single-tower methodology; and (4) call a defense expert. As previously stated, since cell tower tracking technique had been widely accepted at the time of defendant's trial, we reject these claims.

Even assuming that defendant has shown that trial counsel's performance was deficient because he failed to challenge Cook's testimony and to call his own expert witness, he has failed to show prejudice. The evidence against defendant was very strong. Three eyewitnesses identified the robbers as African American men. One of the eyewitnesses testified that one of the robbers wore a beanie, and defendant's DNA was found on a beanie in the getaway car. Defendant had extensive phone contact with the driver of the getaway car and his sister on the night of the robbery. He also spoke with his sister from jail and attempted to fabricate an alibi. Moreover, defendant told his cousin on the night of the robbery that he was on the run and was in "trouble with that girl." Thus, it is not reasonably probable that appellant would have received a more favorable outcome if trial counsel had successfully objected to the cell tower tracking evidence or called his own expert witness.

Op. at 6–9 (alterations in original).

As discussed by the state appellate court, Petitioner must establish two things in order to prevail on a Sixth Amendment ineffectiveness of counsel claim. *See id.* at 7. First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of

8

reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Id.* at 697.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 1410–11. The general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

The state appellate court's decision rejecting Petitioner's claim of ineffective assistance of counsel was not contrary to and did not involve an unreasonable application of clearly established federal law. Nor was it an unreasonable determination of the facts in the record before the state court. The appellate court reasonably concluded that Petitioner failed to satisfy both the performance and prejudice prongs of *Strickland*. The Court discusses each prong in turn.

**A. Performance**

The appellate court reasonably held that Petitioner's counsel's actions were reasonable. The actions at issue are counsel's failure to challenge Mr. Cook. As the appellate court recognized, counsel could have reasonably concluded that challenging Mr. Cook would have been futile. *See* Op. at 7–8. An attorney could make such a conclusion, the court held, because Mr.

9

Cook's testimony regarding cell-tower tracking was "widely accepted" in the scientific community such that it satisfied the requirements for testifying regarding new scientific methodologies set forth in *Kelly*, 17 Cal.3d 24 (known as the *Kelly*/*Frye*[2] test).[3] This test places the question of reliability of the evidence in the hands of the relevant scientific community, as opposed to the court. As the *Kelly* court recognized, "rather than turning to the trial judge," California courts "have assigned the task of determining reliability of the evolving technique to members of the scientific community from which the new method emerges." *Kelly*, 17 Cal. 3d at 31 (1976). As to cell-tower tracking technology, the appellate court concluded that an attorney could reasonably believe that the scientific community had satisfied this requirement because numerous courts had admitted and relied on such evidence. *See* Op. at 7–8 (citing cases); *cf.* Resp. at 8 (citing additional California cases). From there, the appellate court concluded that Petitioner's counsel could have reasonably determined that filing a motion to exclude Mr. Cook's testimony would have been futile. It then held that such a determination by counsel does not constitute deficient performance. *See* Op. at 7 (citing *People v. Price*, 1 Cal. 4th 324, 387 (1991) ("Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[F]ailure to take a futile action can never be deficient performance . . . ."). Each of these determinations by the appellate court was imminently reasonable.

Petitioner's arguments to the contrary are unavailing. First, Petitioner appears to argue that Mr. Cook's testimony fails under the evidence standard articulated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993), or perhaps—read more generously—that the appellate court should have applied the *Daubert* test, as opposed to the *Kelly*/*Frye* test. *See, e.g.*, Pet. at 9 (arguing that Petitioner's counsel should have filed *motion in limine* on "*Daubert*" grounds); *id.* at 10–12 (explaining *Daubert* standard). But *Daubert* involved

---

[2] *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).
[3] Though Petitioner cursorily challenges counsel's actions based on *Kelly*'s other two prongs (that Mr. Cook was unqualified and that Mr. Cook did not use correct scientific procedures), he simply raises these grounds without any accompanying argument. *See, e.g.*, Pet. at 17. Instead, the thrust of his Petition emphasizes the unreliability of the cell-tower tracking technique about which Mr. Cook testified.

an interpretation of the Federal Rules of Evidence, which do not apply to the states, such that the *Daubert* test does not supplant the *Kelly* test. *See Daubert*, 509 U.S. at 585–589. The California Supreme Court has held as much. *See People v. Leahy*, 8 Cal. 4th 587, 604 (1994) ("[W]e conclude that the *Kelly* formulation survived *Daubert* in this state . . . ."). Indeed, Petitioner appears to recognize this fact, stating that "the [*Daubert*] [C]ourt's opinion was based not on Constitutional grounds, but rather an interpretation of Rule 702 of the Federal Rules of Evidence, thus this state was not bound to follow *Daubert*." Pet. at 10. Yet elsewhere in his Petition, Petitioner appears to claim that the California Supreme Court decision in *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747 (2012) somehow narrowed the *Kelly*/*Frye* test. *See* Pet. at 12. But the court in *Sargon* explicitly upheld its decision in *Leahy* in full, stating "[n]othing we say in this case affects our holding in *Leahy* regarding new scientific techniques." *Sargon*, 55 Cal. 4th at 772 n.6. As such, the *Kelly*/*Frye* test applies in California, and Petitioner has failed to demonstrate that the appellate court applied the incorrect law here.

Petitioner's other line of attack pertains to the merits and reliability of cell-tower tracking methodologies generally. Throughout his Petition, Petitioner argues that his counsel should have challenged Mr. Cook because cell-tower tracking methodologies are unreliable. For example, he attaches an article that he claims demonstrates the "[c]ontroversy regarding cell phone tower tracking expert testimony was a hot topic among criminal defense attorney's [sic] for at least a year" before Petitioner's trial. Pet. at 9, 15 (citing Ex. B to Pet.). He also attaches a June 2011 ABA Journal article entitled "Prosecutors' use of mobile phone tracking is 'junk science,' critics say," that discusses some of the shortcomings of cell-tower tracking methodologies. *See* Ex. A to Pet. And finally, he includes a declaration from a purported expert in the field, Mr. Manfred Schenk, who avers that that cell-tower methodology is "not scientifically valid or reliable in its forensic application for its lack of corroboration measurements necessary to establish locations." *See* Ex. C to Pet. ¶ 7.

Unfortunately for Petitioner, these arguments focus on the wrong question. This Court is not required (or even permitted) to answer the question of whether cell-tower methodology was reliable when Petitioner went to trial. Instead, the *underlying* question here is whether Petitioner's

11

counsel *reasonably determined* that such evidence was clearly admissible under *Kelly*, such that he could reasonably determine that a challenge to such evidence would be futile. What's more, the *ultimate* question this Court must answer is even more difficult for Petitioner, because this Court asks only whether the state appellate court's decision on the underlying question of futility was reasonable. Though Petitioner has successfully pointed to a few criticisms of cell-tower technology at the relevant time, this evidence is not sufficient to overcome the weight of case authority relied upon by the state appellate court for its determination that cell-tower tracking methodologies were "widely accepted" in the scientific community.

For the same reasons, and because trial counsel is afforded wide deference in his or her choice of how to present evidence most effectively, the appellate court reasonably concluded that Petitioner's counsel did not act unreasonably in failing to call his own expert witness or challenge Mr. Cook more fiercely on cross. *See Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation."); *Pulido v. Grounds*, No. 13-CV-01814-TLN, 2015 WL 6123616, at *17–*19 (E.D. Cal. Oct. 16, 2015) ("The failure to support a *Kelly* motion may well have been reasonable in that any evidentiary contest was sure to be met with a blizzard of authority to the opposite conclusion."). Thus, the state court reasonably determined that Petitioner's counsel's decision not to challenge this evidence was not unreasonable.

Accordingly, the state court reasonably held that Petitioner's counsel's performance was not ineffective.

**B.    Prejudice**

Even were the appellate court's decision regarding Petitioner's counsel's performance unreasonable, the court reasonably determined that Petitioner was not prejudiced by any such error. The *Strickland* standard for prejudice is a high bar; Petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *i.e.*, that the jury would have changed its verdict. *Strickland*, 466 U.S.

12

at 694. This he cannot do.

As the state appellate court recognized, the evidence against Petitioner was substantial, including the following:

- Several witnesses identified the robbers as having dark skin or being African American (like Petitioner)
- A witness stated that one of the robbers wore a beanie
- A beanie was located in the get-away car. The beanie had DNA on it that matched to Petitioner (with a one in 300 billion chance that the DNA was not Petitioner's)
- Petitioner told his cousin on the night of the robbery that he had "got in trouble" and "been in trouble with the girl" and said "he was going to have to go on the run"
- Petitioner called Daigle, the get-away-car driver, several times on the night of the robbery
- Petitioner's sister testified that when he referred to "the girl," she believed him to mean Daigle
- Petitioner asked his sister to serve as an alibi for him

*See* Op. at 2–6. In light of this weighty evidence against Petitioner, the state appellate court reasonably determined that Petitioner's counsel's failure to challenge Mr. Cook's evidence was not prejudicial.

## V. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: November 30, 2018

_____
BETH LABSON FREEMAN
United States District Judge